# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| GERALD GEORGE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 08 C 3799 |
| | ) | |
| KRAFT FOODS GLOBAL, INC., et al., | ) | Judge Ruben Castillo |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Gerald George, Cathy Dunn, and Timothy Streff bring this class action on behalf of

themselves and all other similarly situated persons (collectively, "Plaintiffs"),[1] against Kraft

Foods Global, Inc. ("Kraft Global"), Kraft Foods, Inc. ("Kraft"), Kraft Foods Global, Inc.

Management Committee of Employee Benefits ("Kraft Employee Benefits Committee"), Kraft

Foods Global, Inc. Administrative Committee ("Kraft Administrative Committee"), the

Compensation and Governance Committee of the Kraft Foods, Inc. Board of Directors ("Kraft

Compensation Committee"), Kraft Foods Global, Inc. Benefits Investment Committee ("Kraft

Benefits Investment Committee"), and the Kraft Benefits Investment Group (collectively, "Kraft

Defendants"). (R. 107, Second Am. Compl.) Additionally, Plaintiffs name Altria Corporate

Services, Inc. ("Altria Services"), the Corporate Employee Plans Investment Committee of the

Board of Directors of Altria Group, Inc. ("Altria Investment Committee"), and the Benefits

Investment Group of Altria Corporate Services, Inc. ("Altria Benefits Investment Group")

---

[1] Andrew Swanson was formerly a named plaintiff in this action. (R. 107, Second Am.
Compl.) On May 19, 2010, Plaintiffs filed a motion to withdraw Swanson as a named plaintiff.
(R. 161, Pls.' Mot. to Withdraw.) The Court granted their motion on June 1, 2010. (R. 163,
Min. Entry.)

(collectively, "Altria Defendants"), as defendants. (*Id.*) Plaintiffs allege that the Kraft and Altria

Defendants (collectively, "Defendants") breached fiduciary duties established by the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and seek

declaratory, monetary, and equitable relief. (*Id.*) Presently before the Court is Defendants'

motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (R. 199, Defs.'

Mot.) For the reasons stated below, the motion is granted in part and denied in part.

## RELEVANT FACTS[2]

### I.     Types of pension plans

A company establishing a pension plan has a choice of two models: a defined benefit plan

or a defined contribution plan. A defined benefit plan assures participants whose rights have

vested that they will receive a specified payout upon retirement. This payout amount is

determined by a formula, and is achieved via the creation of a trust used to fund payments

pursuant to the formula. (R. 216, Pls.' Resp. to Defs.' Facts ¶ 95.) In contrast, in a defined

contribution plan there is no promise of a specified payout upon retirement. Rather, benefits are

simply the amount of an employee's contributions to the plan plus earnings on those

---

[2] The relevant facts have been culled from Defendants' Local Rule 56.1 Statement of
Material Facts ("Defs.' Facts"), Plaintiffs' Local Rule 56.1 Response ("Pls.' Resp. to Defs.'
Facts") and Statement of Additional Facts ("Pls.' Facts"), and Defendants' Response to
Plaintiffs' Statement of Additional Facts ("Defs.' Resp. to Pls.' Facts"). The Court also relied
upon exhibits contained in Plaintiffs' Appendix of Exhibits in Opposition to Defendants' Motion
for Summary Judgment ("Pls.' App.") and Defendants' Appendix in Support of their Motion for
Summary Judgment ("Defs.' App."). In determining what is disputed, the Court does not rely
upon the parties' assertions regarding whether a factual statement is indeed in dispute. Rather,
because of the parties' pattern of reflexively disputing facts which are not (at least based on the
present record) actually disputed, the Court will review the record to independently determine
whether the facts presented in the parties Local Rule 56.1 Statements are either unsupported by
the present record or contradicted by another piece of evidence that is presently before the Court.
Unless otherwise indicated, the following facts are undisputed.

contributions. (*Id.* ¶ 96.)

## II.     Overview of the Kraft Thrift Plan and its structure

Plaintiffs are current or former participants in the Kraft Foods Global, Inc. Thrift Plan (the "Plan"). (*Id.*) The Plan, which was sponsored by Kraft Foods Global, is a defined contribution plan.[3] (*Id.* ¶ 3.) Between 1994 and 2010, the Plan had between approximately 28,000 and 55,000 participants, and between $1.5 and $5.4 billion in assets. (*Id.*) Defendants are all alleged to be, or to have been at certain times, Plan fiduciaries. (*Id.* ¶ 4.)

The Plan document specifies that the Investment Committee will be responsible for, *inter alia,* controlling and managing the investment of Plan assets, selecting and monitoring investment funds offered under the Plan, and providing participants with information about the Plan's investment options. (*Id.* ¶ 5.) This responsibility was held by various entities during the relevant time period. From at least 1994 to October 2001, the Altria Investment Committee was the Investment Committee for the Plan. (*Id.*) This role was assumed by the Kraft Compensation Committee from October 2001 to January 2004. (*Id.*) From January 2004 to the present, the Kraft Benefits Investment Committee took on the role as the Plan's Investment Committee. (*Id.*) Along with its duties with respect to the Plan, the Investment Committee is also responsible for investment matters pertaining to certain defined benefit pension plans sponsored by Kraft or Altria ("Defined Benefit Plans"). (*Id.*)

---

[3] The Plan is of the type that is popularly known as a 401(k) plan. (*Id.* ¶ 3.) 401(k) plans commonly use three types of investment vehicles: mutual funds, commingled trusts, and separate accounts. (*Id.* ¶ 49.) Mutual funds are SEC-regulated investment vehicles, which are publicly available to any investor who meets the mutual fund's minimum investment criteria. (*Id.*) Commingled trusts are private investment vehicles that pool the assets of several large investors for a common investment objective. (*Id.*) Separate accounts are accounts managed by an investment manager for one investor, such as a single retirement plan. (*Id.*)

Plan participants control the investment of their own Plan accounts and may elect to invest a portion of their before- and after-tax earnings in any combination of investment options available under the Plan. (*Id.* ¶ 7.) Indeed, the Plan allows participants to exercise control over their accounts, and participants can make changes to their investment elections at any time. (*Id.* ¶ 14.) The investment options available to a participant are limited to the investment options that the Investment Committee selects for the Plan. (*See id.*) Between June 1995 and July 2008, Plan participants could invest in the following eleven investment options provided by the Plan: (1) Altria Stock Fund; (2) Government Obligations Fund; (3) Interest Income Fund; (4) U.S. Large Cap Equity Index Fund; (5) Balanced Fund; (6) International Equity Fund; (7) Euro Equity Fund; (8) Kraft Stock Fund; (9) Mid-Small Cap Equity Fund; (10) Growth Equity Fund; and (11) a series of Target Date Funds. (*Id.* ¶ 7.) As described in greater detail below, Plaintiffs challenge the inclusion of the Growth Equity Fund and Balanced Fund as Plan investment options. Prior to delving into the facts regarding these two investment options, the Court will first give a brief overview of various Plan communications which provided participants with information regarding the Plan's investment options during the relevant time period.

## III. Plan communications

Several publications and sources described the Plan's investment options, including Summary Plan Descriptions ("SPDs"), Quarterly Statement inserts ("statement stuffers"), Fund Fact Sheets, prospectuses, investment guides, an independent investment provider, and the Plan website. (*Id.* ¶ 8.)

### A. SPDs

SPDs, which are required by law to be distributed to participants by various means,

provide a short explanation of the investment options offered by the Plan. (*Id.* ¶ 9.) These documents generally encouraged participants to diversify their investments by selecting a combination of the offered investment funds. (*Id.*) Each SPD issued through March 2007 detailed the annualized performance of each investment option in the Plan. (*Id.* ¶ 10.)

The SPDs furnished to participants provided descriptions of each fund option in the Plan, which included a description of asset mix and investment objectives. (*Id.* ¶ 11.) The 1995 SPD, for example, described the Growth Equity Fund and Balanced Fund as follows:

> [Growth Equity Fund] The Growth Equity Fund is primarily invested in common stocks considered to have better-than-average prospects for long term growth. The companies chosen for investment typically have faster growing sales and earnings, and generally are smaller in size than the companies in The Equity Index Fund.
>
> The Growth Equity Fund's value depends on the market value of stocks it holds, and on dividends paid and reinvested in the Growth Equity Fund.
>
> . . . .
>
> [Balanced Fund] In general, the assets of the [Balanced Fund] may be invested according to the following mix: 40% to 70% in stocks, 20% to 55% in bonds, and 0% to 25% in money market instruments. Adjustments are made gradually over time to favor asset classes that the manager believes will provide the most favorable total return given market conditions and the economic outlook.
>
> The Balanced Fund's value depends on the market value of the stocks, bonds, and money market instruments it holds. Dividends and interest income are reinvested in the Fund.
>
> (*Id.* ¶ 11.)

Subsequent SPDs provided similar descriptions of these funds to the extent they were offered as investment options. (*Id.*) Beginning in July 2007, SPDs have directed participants to consult the quarterly fund fact sheets for fund performance. (*Id.* ¶ 12.) Further, various SPDs

informed participants about the means by which they could obtain additional information regarding the Plan and their investments. (*Id.* ¶ 15.)

**B.    Statement stuffers**

Additionally, information regarding the Plan, including certain information regarding fees, investment performance, and Plan changes, is included in the statement stuffers mailed to participants quarterly. (*Id.* ¶ 16.) At least since 1995, every statement stuffer has contained annualized, historic, and quarterly information regarding the performance of each investment option. (*Id.*) Certain statement stuffers also included detailed information about the Growth Equity Fund and Balanced Fund. (*Id.* ¶ 17.)

**C.    Fund Fact Sheets**

SPDs and other Plan communications identify the Fund Fact Sheets as the source of information about investment options. (*Id.* ¶ 19.) The Plan issues Fund Fact Sheets to all new participants, and, on occasion, mails them to existing participants. (*Id.* ¶ 20.) Since at least 1996, the quarterly updated Fund Fact Sheets have disclosed each investment option's annualized one-, three-, and five-year performance and cumulative investment performance, and have set forth the total fees associated with each investment option. (*Id.*) Additionally, since September 2000, these Fund Fact Sheets have shown fund performance against a benchmark. (*Id.*) Each Fund Fact Sheet also provides information regarding the asset mix and investment objectives of a fund. (*Id.*) Moreover, the Fund Fact Sheets, in combination with other Plan disclosures, identify which funds are actively managed and which are passive/index funds. (*Id.* ¶ 20.)

**D.    Prospectus**

Along with the aforementioned sources of information, the prospectuses mandated by the

Securities Exchange Commission ("SEC") for the Growth Equity Fund and Balanced Fund were provided to certain Plan participants. (*Id.* ¶ 21.) These prospectuses contained additional investment and performance information, including performance compared to certain benchmarks. (*Id.*)

## E.     Other sources of information

Participants also had access to other sources of information about their investment options. (*Id.* ¶ 22.) For example, investment guides were issued to all Kraft employees in 1995, 1998, 1999, 2002, and 2003, as well as to any new participants or upon participant request. (*Id.*) These guides explained that participants were responsible for making investment decisions, provided information regarding each investment option in the Plan, and referred participants to SPDs and prospectuses. (*Id.*) Additionally, online financial advice has been offered to all participants since 2002. (*Id.*) Finally, SPDs, Fund Fact Sheets, and other information regarding Plan fees and fund options are also available to Plan participants on a website maintained by the Plan's recordkeeper since 1999.

With this general background in mind, the Court now turns to the relevant facts regarding the Growth Equity Fund and the Balanced Fund.

## IV.     The Funds

In support of their motion, Defendants present various facts regarding the selection, monitoring, and performance of the Growth Equity Fund and Balanced Fund. Additionally, they submit facts describing the process by which certain investment options were removed and others retained.

## A.     Selection

7

To improve opportunities for participants to diversify their Plan accounts, the Investment

Committee, in June 1994, approved a recommendation to increase the number of options by

adding a Balanced Fund, an International Equity Fund, and a U.S. Growth Equity Fund. (*Id.* ¶

25.) Mark Werner of Altria Benefits Investment Group was responsible for recommending

managers for these new funds. (*Id.*) At the same time it was increasing the number of

investment options, the Plan was being amended to move from monthly to daily valuation and

trading, which meant that the value of each investment would be established daily on a per unit

basis so that participants could change their Plan investments on a daily, rather than monthly,

basis. (*Id.* ¶ 26.)

To identify possible managers for these funds, Werner and the Altria Benefits Investment

Group engaged in a due diligence process in which they identified investment manager

candidates that offered a daily valued product, had at least a seven-year track record of running

live funds (albeit not necessarily the fund options being considered), and had at least $500

million under management. (*Id.* ¶ 27.) Utilizing Morningstar's database to collect data and

analyze potential managers, as well as compiling information from peer companies, Werner and

the Altria Benefits Investment Group identified nineteen balanced fund and fifteen growth equity

fund managers which were then reviewed for, among other things, risk/performance, investment

strategy, size, management, and fees. (*Id.*) In addition, not only did Werner and the Altria

Benefits Investment Group meet with the recommended candidates, but Werner also checked

with his peers at similarly sized companies to cross check some of the funds and fund families to

learn of their experiences with these funds and whether they would recommend them. (*Id.*)

Werner and the Altria Benefits Investment Group ultimately recommended that the

Investment Committee use the Institutional Asset Management Fund for the Balanced Fund because it had the highest seven-year return with relatively low risk; was the only fund reported as having had a lower risk and a higher return than the neutral 55% stocks, 35% bonds, and 10% cash mix for the prior seven years; had outperformed its benchmark by 343 basis points annually since its inception; and had placed in the first quartile over three, five, seven, and ten year periods in the TUCS comparative performance universe.[4]  (*Id.* ¶ 28.)  In addition to using active management for its equity and bond portfolios, this fund also constantly adjusted its asset allocation (the precise mix of stocks, bonds, and cash) using techniques that relied upon 125 fundamental inputs which measured monetary policy, market valuation, volatility, inflation, and investor sentiment.  (*Id.*)

Because mid-to-small market capitalization ("mid-cap" and "small-cap") portfolios are inherently more volatile than the large capitalization ("large-cap") portfolios (such as the S&P 500 index which was already offered as a Plan investment option), Werner and the Altria Benefits Investment Group recommended that the Investment Committee use active management instead of passive management for the Growth Equity Fund to control volatility while still providing fair returns.  (*Id.* ¶ 29.)  Werner and the Altria Benefits Investment Group were looking for a fund that provided attractive performance, but not necessarily the highest return, and correspondingly reduced volatility because they felt that the increased volatility of returns that would go along with higher returns was unacceptable for a defined contribution retirement plan.  (*Id.*)  When selecting options to be offered to the 30,000 individual participant investors in the

---

[4]  The TUCS comparative performance universe is a database of information about institutional investment managers.  (*Id.* ¶ 28.)

9

Plan, Werner and the Altria Benefits Investment Group felt that risk control was important because not all participants would be willing to tolerate higher volatility of returns. (*Id.*)

Ultimately, Werner and the Altria Benefits Investment Group recommended the American Century Heritage Fund for the Growth Equity Fund. (*Id.* ¶ 30.) This fund had an investment strategy that focused on holding stock in companies with accelerating earnings growth. (*Id.*) Of the funds Werner and the Altria Benefits Investment Group considered, the Heritage Fund had the fourth highest seven-year return with lower risk than the other funds. (*Id.*)

In September 1994, after a review and discussion of the recommendations, the Investment Committee approved the recommendation to utilize the Institutional Asset Management Fund for the Balanced Fund, the Heritage Fund for the Growth Equity Fund, and the EAFE Index Fund for the new International Equity Fund. (*Id.* ¶ 31.) After information on the new and existing fund options was communicated to participants, the Growth Equity Fund and Balanced Fund became available for investments in June 1995. (*Id.*)

## B. Monitoring

Along with a description of the process by which the Growth Equity Fund and Balanced Fund were selected as Plan investment options, Defendants also point to their efforts to monitor these investments. Specifically, they highlight their efforts monitoring investment managers, reviews of Plan investment options, and the use of benchmarking.

### 1. Monitoring of investment managers

One of the principal responsibilities of the Altria Benefits Investment Group was to

monitor the performance of investment managers for the Kraft retirement plans.[5] (*Id.* ¶ 33.) The majority of the investment options were passive index funds (funds designed to match rather than beat the performance of a particular index), so monitoring was limited to tracking fund expenses and performance to ensure that any "tracking error" (*i.e.*, discrepancy between the fund performance and the benchmark index) was acceptable. (*Id.*)

To monitor the Plan's active investment managers (including the Growth Equity Fund and Balanced Fund), the Altria Benefits Investment Group engaged in, *inter alia*, the following activities: (i) meeting at least annually with the investment managers to discuss their performance and to get their latest views on the portfolio and industry trends; (ii) regular telephone and email communication with the managers about performance, investment portfolios, their investment management team, and relevant industry trends; (iii) receiving at least quarterly updates from the managers about their performance and the market in general; (iv) contacting managers any time the Altria Benefits Investment Group had a question or concern about their performance; (v) independent analysis and research regarding manager performance compared to peers; (vi) review of fund ratings from Morningstar; and (vii) using other tools to evaluate how manager performance compared to various benchmarks. (*Id.* ¶ 34.)

The Altria Benefits Investment Group provided the Investment Committee with regular reports on the performance of Plan investment options. (*Id.* ¶ 36.) Before Investment Committee meetings when Plan investments were to be addressed, the Altria Benefits Investment Group prepared reports for the Investment Committee showing the allocation of assets among options

---

[5] While the Altria Benefits Investment Group had this responsibility, the record indicates that the Investment Committee was also responsible for the "monitoring of investment performance." (R. 204, Defs.' App., Ex. 16A at KRAFTG0007485-7486.)

and the historical performance of those options net of fees in comparison to various benchmarks. (*Id.*)

## 2. Reviews of Plan investment options

As further evidence of their efforts to monitor Plan investment options, Defendants also point to four specific reviews of Plan investment options that took place between October 1996 and June 2000.

In October 1996, in light of the addition of new investment options, the Investment Committee reviewed a five-year analysis of participants' asset allocation, transfer activity, and diversification within the Plan, as well as investment option performance. (*Id.* ¶ 38.) The Altria Benefits Investment Group recommended several changes to the actively managed Interest Income Fund, which, after discussions over several meetings, the Investment Committee rejected. (*Id.*)

In April 1999, when the Investment Committee was considering exiting international equities as well as small-cap and mid-cap U.S. equities in the defined benefit pension plan, the Investment Committee, after discussion and deliberation, approved adding a Euro Equity Fund to the Plan. (*Id.* ¶ 39.) During the same meeting at which the Euro Equity Fund was recommended and approved, Werner reviewed the pension fund's first quarter performance. (R. 204, Defs.' App., Ex. 16AOO-8 at ALT0019356.)

In the first quarter of 2000, just months after the Investment Committee changed its defined benefit pension plan asset allocation strategy to eliminate international and mid/small-cap U.S. equities and to invest its entire equity allocation in a passively managed large-cap US equity portfolio, the Investment Committee considered and approved a proposal from the Growth

12

Equity Fund's manager, American Century, to eliminate the underlying mutual fund's (*i.e.*, the Heritage Fund) requirement that at least 60% of assets be invested in dividend-paying companies. (R. 216, Pls.' Resp. to Defs.' Facts ¶ 40.)

After receiving notice of this proposed change, Altria Benefits Investment Group performed an analysis of the Heritage Fund's investment strategy, historical performance, and risk profile to ensure, among other things, that it still made sense to use the Heritage Fund for the Growth Equity Fund given the proposed change. (*Id.* ¶ 41.) Although the Altria Benefits Investment Group had some initial concerns about how the Growth Equity Fund would continue to control risk, after discussions with American Century management about the use of additional risk control techniques, the Altria Benefits Investment Group recommended that the Altria Investment Committee vote in favor of the change. (*Id.*)

At the June 2000 meeting, Werner made a presentation to the Investment Committee that reviewed the original reasons for selecting the Heritage Fund, the Heritage Fund's ongoing objectives, the Heritage Fund's performance against the S&P 400 Index (the Heritage Fund's published benchmark) and Russell 2500 Growth Index (an internal benchmark), and the shareholder proposal. (*Id.* ¶ 42.) The Investment Committee expressed no concerns about maintaining the Heritage Fund as a Plan investment option as a result of this review. (*Id.* ¶ 43.)

### 3. Benchmarking

Defendants also used benchmarking as a tool to monitor Plan investment options. A benchmark is a point of reference, often an index like the S&P 500, which is used as a point of reference to evaluate a particular investment. (*Id.* ¶ 44.) Defendants communicated benchmarks and performance compared to benchmarks to Plan participants and used benchmarks for internal

monitoring of manager performance. (*Id.*) For the Balanced Fund, the Altria Benefits Investment Group used the benchmark reported by the pension fund in its SEC required prospectus. (*Id.* ¶ 45.) On the other hand, for the Growth Equity Fund, the Altria Benefits Investment Group used different benchmarks for participant communications and internal monitoring purposes. (*Id.* ¶ 46.)

### C.    Performance

#### 1.    Growth Equity Fund

The Heritage Fund had positive returns, net of fees, throughout its time as a Plan investment offering. (*Id.* ¶ 102.) From May 15, 1995 through June 30, 2005, it returned 138%. (*Id.*) As of June 30, 2002, Morningstar's rating for the Heritage Fund was 4-stars (out of a possible 5), indicating that the Heritage Fund was in the top 32.5% of all funds. (*Id.* ¶ 105.) Additionally, the Heritage Fund's three-, five-, and ten-year returns were rated by Morningstar as "Above Average," "Average," and "Above Average," respectively, and it ranked in the top 15th, 35th, and 34th percentiles of its peer group based on three-, five-, and ten-year annualized returns, respectively. (*Id.*) Morningstar also classified the Heritage Fund's risk over three-, five-, and ten-year periods as below average. (*Id.*) In its June 2004 evaluation, Morningstar reduced the Heritage Fund's rating to three stars, and its three-year return was "Average." (*Id.*) In May 2005, the three-year return rating had fallen to "Below Average." (*Id.*)

Volatility of the Heritage Fund between May 1995 and June 2005 was comparable to the volatility of the benchmark reported on the prospectuses and Fund Fact Sheets, and lower than that of the internal benchmarks reviewed by the Investment Committee. (*Id.* ¶ 107.) The Heritage Fund's volatility was also lower than the average of other mutual funds in the same

Morningstar category. (*Id.*)

### 2. Balanced Fund

The Balanced Fund has had positive returns, net of fees, since its inception. (*Id.* ¶ 108.) From May 15, 1995 through August 31, 2010, it returned 155%. (*Id.*) As of June 30, 2008, the Balanced Fund's performance as reported to the Investment Committee was over 100 basis points above the benchmark at one, three, and five years. (*Id.* ¶ 109.) While the Balanced Fund's cumulative returns from May 1, 1995 through August 31, 2010 were 18.8 percentage points lower than the benchmark's cumulative return, it outperformed the benchmark in 10 of the 14 full years since 1995. (*Id.*)

### D. Removal and retention

By mid-2003, the Altria Benefits Investment Group became concerned that the Heritage Fund was lagging behind the benchmark used to track the Heritage Fund's performance. (*Id.* ¶ 62.) After this point, the Altria Benefits Investment Group increased monitoring of the Heritage Fund to determine why it was not performing as expected. (*Id.*)

Werner subsequently performed a review of the Heritage Fund in which he concluded that half the underperformance could be attributed to rapid price growth among "trash stocks" that drove up the performance of the benchmark index.[6] (*Id.* ¶ 63.) According to Werner, poor stock selection also contributed to the Heritage Fund's underperformance. (*Id.*) Additionally, during this review, American Century raised the following points regarding the Heritage Fund: (1) it still operated according to the original premise that it would be a more conservative fund

---

[6] Trash stocks are stocks of companies that did not have earnings. (*Id.* ¶ 63.) Heritage Fund investment policies precluded investing in these stocks. (*Id.*)

with lower volatility; (2) independent investment advisor Financial Engines gave high scores to both the institutional and investor class shares; (3) since the addition of the Heritage Fund, its three-year and five-year returns exceeded the Russell 2500 Growth Index in 54 out of 62 periods for three years and every period for five years; and (4) compared to the Morningstar mid-cap universe, the Heritage Fund's three-year rankings were above the median in 20 out of the last 20 periods. (*Id.* ¶ 65.) In early 2004, in response to the Altria Benefits Investment Group's concerns, American Century replaced the Heritage Fund's team leader. (*Id.* ¶ 66.) Werner met with the new manager two or three times to discuss the Heritage Fund's investment strategy. (*Id.*)

After this review, the Altria Benefits Investment Group continued to obtain frequent reports from American Century. (*Id.* ¶ 67.) As 2004 proceeded, however, Werner did not see the turnaround he hoped for. (*Id.*) Ultimately, Werner concluded that it was likely to take unacceptably long for the Heritage Fund to recover from its recent underperformance relative to its benchmarks. (*Id.*) As a result, the Werner and the Altria Benefits Investment Group decided to recommend that the Heritage Fund be removed as a Plan investment option. (*Id.*) Werner advised the Investment Committee of his conclusion at its December 8, 2004 meeting; the Investment Committee then designated Jim Dollive to review the Growth Equity Fund to determine if it should be replaced. (*Id.* ¶ 68.) Werner provided Dollive with a presentation setting forth the rationale for selecting the Heritage Fund; the Heritage Fund's investment policy; the Altria Benefits Investment Group's monitoring of the Heritage Fund and the latest performance metrics based upon the new 50% Russell Midcap and 50% Russell Midcap Growth benchmark; and why the Altria Benefits Investment Group recommended the change. (*Id.* ¶ 69.)

16

After Werner and the Altria Benefits Investment Group investigated potential investment managers, State Street Global Advisors was selected to manage the US Mid/Small-Cap Equity Index Fund, which served as a replacement for the Heritage Fund. Given several complicating factors, including the size of the Plan's investment in the Heritage Fund, the need to resolve how to exit the Heritage Fund without causing losses to participants, the need to notify participants of the change, and the need to complete negotiations with State Street, the transition to a new fund did not occur until June 30, 2005. (*Id.* ¶ 70.)

The Plan notified participants of the pending change in the April 2005 quarterly statement stuffer, and alerted them that the Growth Equity Fund, a mutual fund, was being replaced with an index fund, the US Mid/Small-Cap Equity Index Fund, and that additional information would be forthcoming. (*Id.* ¶ 71.) The official fund change notice was mailed to participants in June 2005, and the Growth Equity Fund was removed effective June 30, 2005. (*Id.*) The notice contained a Fund Fact Sheet describing the US Mid/Small-Cap Equity Index Fund, identified its manager and investment strategy, and compared its historical five-year performance to its benchmark, the Russell Small Cap Completeness Index. (*Id.*)

## V.     The Defined Benefit Plans

During the 1994-1999 period, the Investment Committee used active domestic equity managers in the small- and mid-cap market segments to complement a large investment in an S&P 500 index fund for the Defined Benefit Plans. (*Id.* ¶ 89.) In April 1999, the Investment Committee carried out a full review of the Defined Benefit Plans. (*Id.* ¶ 90.) During this review, Investment Committee member John Reed suggested investing four or five years of defined benefit payments in fixed income and investing all remaining assets in an S&P 500 index fund.

(*Id.*) This was a change from prior investment strategies, which diversified Defined Benefit Plans assets across numerous types of investment vehicles. (*Id.*)

At the May 1999 Investment Committee meeting, the Altria Benefits Investment Group presented a review of Reed's proposed asset allocation and investment strategy. (*Id.* ¶ 91.) During this meeting, the Investment Committee "reviewed the advantages and disadvantages of using index management within the equity segments of the [Defined Benefit Plans]. [These] [d]iscussions noted the challenges of selecting consistently successful active managers, low costs of indexing, performance of indexing in down markets, and composition of the popular S&P 500 index." (R. 204, Defs.' App., Ex. 16AOO-9 at KRAFTG0978274.) After review, the Investment Committee approved two changes in overall asset allocation for the Defined Benefit Plans. (R. 216, Pls.' Resp. to Defs.' Facts ¶ 91.) First, five years worth of benefit payments would be held in fixed income. (*Id.*) Second, the remainder of the assets would be held in large-cap U.S. stocks. (*Id.*) Because the Investment Committee's past reviews indicated that active management of large-cap U.S. equities was unlikely to add value (and because the domestic large-cap market was very efficient), they also approved investing the U.S. equity portion of the Defined Benefit Plans assets solely in S&P 500 index investments (*i.e.*, passive investments). (*Id.*)

## PROCEDURAL HISTORY

On July 2, 2008, Plaintiffs initiated this class action against Defendants on behalf of all similarly situated Plan participants. (R. 1, Compl.) Plaintiffs amended their original complaint on November 20, 2008. (R. 61, Pls.' First Am. Compl.) In February 2009, Plaintiffs moved for leave to file their Second Amended Complaint. (R. 82, Pls.' Mot. For Leave to File Second Am.

Compl.) After the Court granted their motion, Plaintiffs filed their Second Amended Complaint (the "complaint") on July 31, 2009. (R. 107, Second Am. Compl.)

On August 31, 2009, Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (R. 112, Mot. to Dismiss.) In December 2009, the Court granted Defendants' motion in part, and denied it in part. *George v. Kraft Foods Global, Inc.*, 674 F. Supp. 2d 1031, 1050 (N.D. Ill. 2009) ("*George II*"). The Court's December 2009 ruling–combined with a joint stipulation entered into by the parties–leaves only Count III of the complaint remaining for consideration.[7]

In Count III, Plaintiffs allege that Defendants violated the fiduciary duties set forth at 29 U.S.C. §§ 1104-05 by including the Growth Equity Fund and Balanced Fund (the "Funds") as Plan investment options. (*See* R. 107, Second Am. Compl. ¶¶ 63-82.) They claim that the selection and retention of the Funds violated the duties established by ERISA because, at the time the decision to invest in them was made, both were expected to underperform relative to comparable investment alternatives. (*Id.* ¶ 78.) In addition, they allege that Defendants failed to properly monitor the Funds. (*Id.*) Moreover, Plaintiffs aver that Defendants actively concealed material information regarding their imprudent decision to select and retain the Funds as Plan investment options. (*Id.* ¶¶ 78, 80.) They bring this count on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2) ("Section 1132(a)(2)"). (*Id.* ¶ 82.)

Presently before the Court is Defendants' motion for summary judgment. (R. 199, Defs.' Mot.) In their motion, Defendants present four grounds in support of their request. First, they

---

[7] On February 22, 2010, the parties jointly stipulated that Counts I and II of the complaint would be dismissed without prejudice against the remaining Altria Defendants. (R. 144, Joint Stipulation of Dismissal.)

contend that this action is barred by res judicata. (*Id.* at 2.) Second, Defendants assert that

Plaintiffs' "challenges to the 1994 decision to add the Funds to the Plan and the alleged failure to

remove them is 1999 are untimely under ERISA's statute of limitations for breach of fiduciary

duty claims[.]" (*Id.*) Third, they maintain that Plaintiffs have offered no evidence that

Defendants' inclusion of the Funds as Plan investment options violated ERISA's duty of

prudence. (*Id.*) Finally, and in the alternative, Defendants assert that Plaintiffs' claims are

barred by ERISA's safe harbor provision. (*Id.* at 2-3.)

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to

the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving

party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "In other words, the

record must reveal that no reasonable jury could find for the nonmoving party." *Keri v. Bd. of*

*Trs. of Purdue Univ.*, 458 F.3d 620, 627 (7th Cir. 2006) (quoting *Dempsey v. Atchison, Topeka,*

*& Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994)). Rule 56 further requires the entry of

summary judgment, after adequate time for discovery, against a party "who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of

the basis for its motion and identifying those portions of the record which it believes demonstrate

the absence of a genuine issue of material fact. *Id.* at 323. The moving party may discharge its

initial responsibility by simply "'showing'—that is, pointing out to the district court—that there is

20

an absence of evidence to support the nonmoving party's case." *Id.* at 325. When the

nonmoving party has the burden of proof at trial, the moving party is not required to support its

motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323.

Once a properly supported motion for summary judgment is made, the nonmoving party

cannot resist the motion and withstand summary judgment by merely resting on its pleadings.

*Keri*, 458 F.3d at 628. Instead, it must come forward with specific facts showing that there is a

genuine issue for trial; raising some metaphysical doubt as to the material facts is not enough.

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

Conclusory allegations, if not supported by the record, will not preclude summary judgment.

*Keri*, 458 F.3d at 628 (citing *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir.

1997)).

## ANALYSIS

### I.     Res judicata

On January 27, 2010, summary judgment was entered in favor of Defendants in a related

case. *George v. Kraft Foods Global, Inc.*, 684 F. Supp. 2d 992 (N.D. Ill. 2010) ("*George I*"). In

*George I*, Plaintiffs alleged that Defendants breached their fiduciary duties in operating and

administering the Plan. *Id.* at 996. According to Defendants, the judgment granted in their favor

in *George I* bars this action. (R. 201, Defs.' Mem. at 6.) Specifically, Defendants invoke the

doctrine of res judicata to support their position. (*Id.*)

The federal courts have traditionally adhered to the related doctrines of res judicata and

collateral estoppel. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Under res judicata (which is also

known as the doctrine of claim preclusion), a final judgment on the merits of an action precludes

21

the parties or their privies from relitigating issues that were or could have been raised in that action. *Id.* (citation omitted). Under collateral estoppel (which is also known as the doctrine of issue preclusion), once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case. *Id.* (citation omitted).

The doctrine of res judicata is premised on the idea that, when a claim has been fully litigated and come to judgment on the merits, finality trumps. *Czarniecki v. City of Chi.*, 633 F.3d 545, 548 (7th Cir. 2011). Under federal law, the doctrine of res judicata has three ingredients: (1) identity of the claim; (2) identity of the parties, which includes those in privity with the original parties; and (3) a final judgment on the merits. *Ross v. Bd. of Educ.*, 489 F.3d 279, 283 (7th Cir. 2007).[8]

After the parties submitted their briefing on Defendants' motion for summary judgment, the Seventh Circuit affirmed in part and reversed in part the judgment in *George I*, and remanded the case for further proceedings. *See George v. Kraft Foods Global, Inc.*, No. 10-1469, 2011 WL 1345463, at *14 (7th Cir. April 11, 2011).[9] Given the Seventh Circuit's disposition of *George I*, Defendants' res judicata argument fails to carry the day. For res judicata to apply, a final judgment on the merits is needed. *Ross*, 489 F.3d at 283. Generally, a judgment is final if it is the rendering court's "last word" on a particular case. Restatement (Second) of Judgments § 13 (1982). For purposes of res judicata, a judgment that is reversed and remanded for further

---

[8] The Court applies federal res judicata principles because the earlier judgment was rendered by a federal court. *Czarniecki*, 633 F.3d at 548 n.3.

[9] Defendants' petition for rehearing en banc was denied on May 26, 2011. (R. 253, Pls.' Notice.)

proceedings is no longer a final judgment; it is therefore stripped of its preclusive effect. *Cf.*

*Salton, Inc. v. Phillips Domestic Appliances and Pers. Care B.V.*, 391 F.3d 871, 881 (7th Cir.

2004) ("[O]nce a judgment is reversed it ceases to have collateral estoppel effect."); *Gosnell v.*

*City of Troy*, 59 F.3d 654, 657 (7th Cir. 1995) (applying Illinois law, noting that a remand

deprives a judgment of preclusive effect). Because the judgment in *George I* is not a final

judgment, the third ingredient in the res judicata recipe is lacking. Accordingly, the Court cannot

grant summary judgment in Defendants' favor on res judicata grounds.

## II.    Statute of limitations

ERISA provides that any plan fiduciary that breaches its fiduciary duties is "personally

liable to make good to such plan any losses to the plan resulting from each such breach." 29

U.S.C. § 1109. The statute, however, limits the time in which an action against a plan fiduciary

for breach of fiduciary duties may be brought. Specifically, it states that no action to recover

such losses can be commenced after the earlier of: (1) three years after the earliest date on which

the plaintiff had actual knowledge of the breach; or (2) six years after the date of the last action

which constituted a part of the breach, or in the case of an omission, the latest date on which the

fiduciary could have cured the breach. *See* 29 U.S.C. § 1113 ("Section 1113").

ERISA provides an exception to this rule where fraud or concealment is involved. In the

case of fraud or concealment, such action may be commenced no later than six years after the

date of discovery of the alleged breach. *Id.* Defendants contend that ERISA's statute of

limitations provision bars Plaintiffs' claims. (*See* R. 201, Defs.' Mem. at 9-13.) Prior to

considering the applicability of the general ERISA statute of limitations, the Court will first

examine whether the exception codified in Section 1113 applies.

23

## A.    Fraud or concealment exception

In cases of "fraud or concealment," ERISA provides that an action may be commenced no later than six years after the date of discovery of the breach of fiduciary duty. 29 U.S.C. § 1113. Notably, the Seventh Circuit has read ERISA's fraud or concealment exception to incorporate fraudulent concealment doctrine. *Radiology Ctr., S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216, 1220 (7th Cir. 1990) (citing *Schaefer Ark. Med. Soc'y*, 853 F.2d 1487, 1491 (8th Cir. 1988)). This exception tolls the running of Section 1113's statute of limitations when the defendant has prevented the plaintiff's timely discovery of the wrong she has suffered. *See id.* "An ERISA fiduciary can delay a wronged beneficiary's discovery of his claim either by misrepresenting the significance of facts the beneficiary is aware of (fraud) or by hiding facts so that the beneficiary never becomes aware of them (concealment)." *Id.* Section 1113's use of the phrase "fraud or concealment" refers "to the steps taken by the defendant to hide the fact of the breach rather than to the underlying nature of [a plaintiff's] claim." *Id.* at 1220.

It is the plaintiff's burden to provide evidence supporting the application of the fraud or concealment exception to ERISA's statute of limitations. *Cf. Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669, 675 (8th Cir. 2009) (noting that the party claiming the benefit of an exception to the operation of a statute of limitations bears the burden of showing that it is entitled to it); *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 509 (3d Cir. 2006) (holding that a plaintiff has the burden of showing that equitable tolling applies). For the fraud or concealment exception to apply, plaintiffs must show "(1) that defendants engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing and that (2) [plaintiffs] were not on actual or constructive notice of that evidence, despite (3) their exercise of due diligence." *Schaefer*, 853 F.2d at 1491-

92; *accord Brown v. Owens Corning Inv. Review Comm.*, 622 F.3d 564, 573 (6th Cir. 2010);

*Larson v. Northrop Corp.*, 21 F.3d 1164, 1172 (D.C. Cir. 1994). This course of conduct must

constitute "actual concealment–*i.e.*, 'some trick or contrivance intended to exclude suspicion and

prevent inquiry.'" *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1095 (7th Cir. 1992).

Because actual concealment requires affirmative acts on the part of the defendant,

"'[c]oncealment by mere silence is not enough.'" *Larson*, 21 F.3d at 1094 (quoting *Wood v.*

*Carpenter*, 101 U.S. 135, 143 (1879)); *Ranke v. Sanofi-Synthelabo, Inc.*, 436 F.3d 197, 204 (3d

Cir. 2006) (noting that an "ERISA fiduciary . . . [must] have taken affirmative steps to hide an

alleged breach of duty from a beneficiary in order for the 'fraud or concealment' exception to

apply").

        In this case, Plaintiffs' invocation of the fraud or concealment exception fails for two

reasons. First, Plaintiffs fail to provide evidence of a course of conduct on the part of Defendants

designed to conceal the alleged breaches of fiduciary duty. In their memorandum, Plaintiffs

merely point to three statements which, according to them, establishes that Defendants concealed

facts about the Funds. (R. 218, Pls.' Mem. at 11.) Specifically, they point to (1) a statement

which allegedly failed to mention the "true cause" of the Growth Equity Funds'

underperformance–the "known futility" of active management; (2) a statement to a participant

touting actively managed small-to-mid cap stock funds; and (3) a communication to a participant

stating that "you will not find more cost effective investments elsewhere." (*Id.*) As a threshold

matter, the first statement Plaintiffs point to cannot enter into the Court's analysis because what

Plaintiffs object to is not what Defendants said, but rather what they didn't say. Unfortunately

for Plaintiffs, silence is not enough to constitute concealment under this exception; affirmative

steps on the part of a defendant are needed. *Larson*, 21 F.3d at 1094; *Ranke*, 436 F.3d at 204.

The remaining two statements—which, according to Plaintiffs were made to "a participant"— do

not, taken together, add up to a course of conduct on the part of Defendants designed to conceal

the alleged breaches of fiduciary duty. To successfully invoke this exception, more than simply

two statements is needed. *See, e.g., Martin*, 966 F.2d at 1095-96 (applying the exception where

defendants channeled and falsely labeled kickbacks through a dummy corporation). Since

Plaintiffs have failed to point to evidence of a course of conduct designed to conceal the alleged

breaches of fiduciary duty, they cannot avail themselves of the fraud or concealment exception to

ERISA's statute of limitations.[10]

In addition, Plaintiffs' attempt to rely on the fraud or concealment exception is

unsuccessful because they have not pointed to any evidence suggesting that they exercised due

diligence in uncovering the evidence of wrongdoing that, according to them, Defendants

concealed. (*See* R. 218, Pls.' Mem. at 11-12.) It is their burden to provide evidence supporting

the application of the fraud or concealment exception to ERISA's statute of limitations, and they

have failed to carry it. Accordingly, Plaintiffs are unable to take advantage of ERISA's fraud or

concealment exception.

## B.     General ERISA statute of limitations

Because the fraud or concealment exception does not apply in this case, the Court must

consider ERISA's general statute of limitations provision, which provides that no breach of

---

[10] In opposing Defendants' motion for summary judgment, Plaintiffs have improperly relied upon facts they have set forth in their pending cross-motion for summary judgment. (R. 218, Pls.' Mem. at 11.) Given the standards at the summary judgment stage, these motions must be considered separately. *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008) (noting that a motion for summary judgment and a cross-motion for summary judgment must be treated separately) (citation omitted).

fiduciary duty action can be commenced after the earlier of: (1) three years after the earliest date

on which the plaintiff had actual knowledge of the breach; or (2) six years after the date of the

last action which constituted a part of the breach, or in the case of an omission, the latest date on

which the fiduciary could have cured the breach. *See* 29 U.S.C. § 1113.

### 1.    Three-year statute of limitations

The three-year statute of limitations period does not begin to run when a violation or

breach occurs, but rather when the person harmed acquires "actual knowledge" of the occurrence.

*Rush v. Martin Petersen Co., Inc.*, 83 F.3d 894, 896 (7th Cir. 1996). Actual knowledge, the

Seventh Circuit has cautioned, must be distinguished from constructive knowledge. *Martin*, 966

F.2d at 1086. To charge a plaintiff with actual knowledge of an ERISA violation, it is not

enough that he had notice that something was awry; he must have had specific knowledge of the

actual breach of duty upon which he sues. *Id.* (quoting *Radiology Ctr.*, 919 F.2d at 1221). "At

the same time, the relevant knowledge for triggering the statute of limitations is knowledge of the

*facts* or *transaction* that constituted the alleged violation. Consequently, it is not necessary for a

potential plaintiff to have knowledge of every last detail of a transaction, or knowledge of its

illegality." *Id.* (citations omitted). Stated differently, the requisite knowledge of an ERISA

violation lies somewhere between "every last detail" and "something was awry." *Id.* In sum, "to

have actual knowledge of a violation to trigger ERISA's three-year statute of limitations, a

plaintiff must know of the essential facts of the transaction or conduct constituting the violation."

*Id.*

While easy to articulate, the three-year statute of limitations' actual knowledge

requirement is a bit more difficult to apply. As the Seventh Circuit observed in *Martin*, the

27

characterization of the relevant transaction and its essential facts is not readily apparent and, like many questions in the law, "turns on the level of generality employed in characterizing the transaction at issue." *Id.* at 1086. The proper characterization, the Seventh Circuit has noted, "will usually turn in part on the complexity of the underlying factual transaction, the complexity of the legal claim, and the egregiousness of the alleged violation." *Id.* Beyond these generalizations, the Seventh Circuit has suggested that "judges, faced with particular contexts and relying on their 'situation sense,' must make the determination." *Id.*

According to Defendants, the three-year statute of limitation applies because Plaintiffs obtained actual knowledge of the alleged breaches in this case through the various communications provided to them which disclosed information about the Funds' asset mix, investment objectives, performance, and fees. (R. 201, Defs.' Mem. at 9-10.) In further support of their contention, they point to disclosures which stated that the "Funds were mutual finds where the managers were actively selecting investments, rather than simply trying to replicate the performance of a benchmark index like many of the Plan's other fund options." (*Id.* at 10.) In short, Defendants suggest that "[g]iven these communications, there can be no question that [P]laintiffs had 'actual knowledge' of the Funds' structure, investment strategy, fees and performance–all of the facts or transactions upon which their claim is based–more than three years before filing suit." (*Id.*)

In considering Defendants' attempt to rely upon the three-year statute of limitations, the Court must first establish the proper characterization of the claim being asserted in this case. To do so, the Court must consider the complexity of the claim and its facts, along with the egregiousness of the claim. *Martin*, 966 F.2d at 1086. First off, the Court notes that Plaintiffs'

claim and the underlying factual transactions are not very complex. Plaintiffs' breach of fiduciary duty claim is based on the selection and retention of the Growth Equity Fund and Balanced Fund as Plan investment options. According to Plaintiffs, Defendants breached their fiduciary duty by selecting and retaining these actively managed funds because, *inter alia*: (1) Defendants retained these actively managed funds even though they stopped using active management for the Defined Benefit Plans; and (2) Defendants failed to properly monitor the Funds. With this characterization in mind, along with the conclusion that Defendants' breach is not particularly egregious, the Court moves on to evaluating Defendants' assertion.

Given these conclusions regarding Plaintiffs' claim, the Court finds that Defendants have failed to show that Plaintiffs had actual knowledge of the breach in this case. Merely pointing to communications which provided information about the Funds' structure, investment strategy, fees, and performance is not enough to provide Plaintiffs' with actual knowledge of the breach of fiduciary duty that Plaintiffs are alleging. At best, these disclosures may have merely suggested to Plaintiffs that "something was awry" with respect to the Funds. As mentioned above, more is required to trigger the three-year statute of limitations. Specifically, to trigger the three-year statute of limitations, a plaintiff "must have had specific knowledge of the actual breach of duty upon which he sues." *Martin*, 966 F.2d at 1086. Since Defendants have failed to provide evidence establishing if and when Plaintiffs had specific knowledge of their breach of fiduciary

duty claim, they cannot rely upon the three-year statute of limitations at this procedural stage.[11]

## 2. Six-year statute of limitations

Given the Court's conclusions regarding Section 1113's exception and the three-year statute of limitations, it is evident that the six-year statute of limitations is applicable. In this case, Plaintiffs filed their initial complaint on July 2, 2008. (R. 1, Compl.) Applying the six-year statute of limitations, the cut-off date for any alleged breaches of fiduciary duty is therefore July 2, 2002. Stated concretely, any alleged breach which took place before July 2, 2002 is not actionable. Thus, any claim regarding the imprudence of the selection and retention of the Funds taking place before July 2, 2002 is time-barred.

To be clear, the application of the six-year statute of limitations does not dispose of Count III. Under ERISA, a fiduciary has a continuing duty to "review plan investments and eliminate imprudent ones." *Martin*, 966 F.2d at 1087-88 (citing 29 U.S.C. § 1104(a)(1)(B)); *Morrissey v. Curran*, 567 F.2d 546, 549 n.9 (2d Cir. 1977). As a result, a fiduciary's failure to review plan investments or eliminate imprudent investment options can constitute a breach of fiduciary duty. In this case, any claim that Defendants failed to do either (and therefore breached their fiduciary duty) after July 2, 2002 is not time-barred. Any alleged breaches that took place before July 2, 2002 are, however, barred by Section 1113.

---

[11] Contrary to Defendants' suggestion, the fact that Plaintiffs obtained information which would have contributed to their actual knowledge of the alleged breach during discovery does not "abolish the statute of limitations as to imprudent investment claims." (R. 233, Defs.' Reply at 7 (citing *Brieger v. Tellabs, Inc.*, 659 F. Supp. 2d 967, 987 (N.D. Ill. 2009)).) As evident from Section 1113, the three-year statute of limitations operates in tandem with the six-year statute of limitations. *See* 29 U.S.C. § 1113. Even if the three-year period does not apply, the six-year statute of limitations would still protect ERISA defendants from stale claims and promote "important social interests in certainty, accuracy and repose." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452-53 (7th Cir. 1990).

## III. Duty of prudence

The Court's statute of limitations analysis narrows the scope of acts or omissions that can constitute actionable breaches of fiduciary duty. At this point of the Court's analysis, the only alleged breaches of fiduciary duty Plaintiffs can rely upon are: (1) Defendants' retention of the Growth Equity Fund from July 2, 2002 until the date it was removed; and (2) Defendants' retention of the Balanced Fund after July 2, 2002. With this clarification in mind, the Court proceeds to considering Defendants' third basis for summary judgment.

As various courts have observed, the duties charged to an ERISA fiduciary are "the highest known to the law." *E.g., Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002). To state a claim for breach of fiduciary duty, the plaintiff must establish "(1) that the defendants are plan fiduciaries; (2) that the defendants breached their fiduciary duties; and (3) that the breach caused harm to the plaintiff." *Jenkins v. Yager*, 444 F.3d 916, 924 (7th Cir. 2006).

Under ERISA, plan fiduciaries must discharge their duties with respect to the plan solely in the interest of the participants and for the exclusive purpose of providing benefits to participants and defraying reasonable expenses of administering the plan. 29 U.S.C. § 1104(a)(1)(A). Fiduciaries must perform their duties with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and like aims." 29 U.S.C. § 1104(a)(1)(B). When enforcing these duties, a "court focuses not only on the merits of the transaction, but also the thoroughness of the investigation into the merits of the transaction." *Chao*, 285 F.3d at 426 (citations omitted); *Eyler v. Comm'r of Internal Revenue*, 88

F.3d 445, 455 (7th Cir. 1996) (citation omitted).

ERISA's legislative history confirms that its fiduciary responsibility provisions codify and make applicable to ERISA fiduciaries certain principles developed in the evolution of the law of trusts. *Howell v. Motorola, Inc.*, 633 F.3d 552, 566 (7th Cir. 2011). Indeed, "ERISA's fiduciary duty was meant to hold plan administrators to a duty of loyalty akin to that of a common-law trustee." *Jenkins*, 444 F.3d at 924 (quoting *Ameritech Benefit Plan Comm. v. Comm. Workers of Am.*, 220 F.3d 814, 825 (7th Cir. 2000)). Accordingly, an ERISA fiduciary must act as though he were a "reasonably prudent businessperson with the interests of all the beneficiaries at heart." *Id.*

According to Plaintiffs, Defendants' retention of the Growth Equity Fund and Balance Fund amounts to a breach of their ERISA duties. Specifically, as previously noted, they appear to make the following claims: (1) Defendants improperly retained the Funds after Defendants, in 1999, decided to eliminate all actively managed domestic equity investments in the Defined Benefit Plans and instead utilized only passively managed domestic equity investments; and (2) Defendants failed to properly monitor the Funds. (R. 182, Pls.' Status Report at 2.) Defendants move for summary judgment on both claims. (*See* R. 199, Defs.' Mot. at 3.)

In their supporting memorandum, Defendants present a number of arguments to buttress their request for summary judgment. Only two warrant written attention. First, Defendants maintain that Plaintiffs' theory of imprudence is unsound because "it makes no sense to judge fiduciaries' actions with regard to a defined contribution plan in light of actions taken with a Defined Benefit Plan." (R. 201, Defs.' Mem. at 21.) Because of the various differences between defined benefit and defined contribution plans, Defendants assert that "the prudence of a defined

contribution plan fiduciary in selecting investment options to offer cannot be determined by looking to his decisions as fiduciary for a Defined Benefit Plan–the two are not enterprises of 'like character and with like aims.'" (*Id.* at 22 (citing 29 U.S.C. § 1104(a)(i)(B)).) Moreover, because of these differences, they assert that "[w]hile the shift in investment strategy may have made sense for the Defined Benefit Plan, it cannot serve as a valid point for comparison for evaluating what investments were offered in the Plan." (*Id.*)

The Court is unpersuaded by Defendants' contention. While there are undoubtedly differences between defined contribution and defined benefit plans, Defendants fail to point to any difference that mandates summary judgment in their favor. Given Defendants' decision to eliminate active investments from the Defined Benefit Plans, the Court, viewing the record in the light most favorable to Plaintiffs, concludes that a reasonable jury could find that a "reasonably prudent businessperson with the interests of all the beneficiaries at heart" would not have retained actively managed investments in the Plan after 1999. Based on, *inter alia*, the Investment Committee's discussions noting the "challenges of selecting consistently successful active managers, low costs of indexing, performance of indexing in down markets," (R. 204, Defs.' App., Ex. 16AOO-9 at KRAFTG0978274), a reasonable jury could conclude that, despite the differences between defined contribution and defined benefit plans, a prudent fiduciary would have offered indexed (*i.e.*, passive) investments rather than actively managed investments as Plan investment options in the market segments covered by the Funds. They could therefore conclude that Defendants' decision to retain the Funds (or failure to make a decision to remove them) constituted a breach of fiduciary duty. Accordingly, Defendants' first argument does not persuade the Court to grant summary judgment.

33

Second, Defendants contend that they are entitled to summary judgment on Plaintiffs'

monitoring claim. (R. 201, Defs.' Mem. at 23.) In support of their motion, Defendants point to

several instances in which they monitored and evaluated the performance of the Funds. (*Id.*) By

doing so, they have satisfied their burden on summary judgment. *Celotex*, 477 U.S. at 322-25.

In response, Plaintiffs have failed to provide evidence of any deficiencies in the manner in which

Defendants monitored the Funds. (*See* R. 218, Pls.' Mem. at 12-15.) As a result, they have

failed to satisfy their burden. *Matsushita*, 475 U.S. at 586-87. The Court therefore grants

Defendants' motion for summary judgment on Plaintiffs' monitoring claim.[12]

## IV.  Safe harbor

Finally, Defendants argue that ERISA's safe harbor provision, 29 U.S.C. § 1104(c), bars

what remains of Plaintiffs' suit. (R. 201, Defs.' Mem. at 24.) In their brief, however, they also

highlight the Seventh Circuit's *Howell* decision which, admittedly, fatally undermines their

argument.  633 F.3d 552, 567 (7th Cir. 2011) (holding that the selection of plan investment

options and the decision to continue offering a particular investment vehicle are acts to which

fiduciary duties attach, and that the safe harbor is not available for such acts).  In light of *Howell*,

Defendants' final argument falls flat.

### CONCLUSION

---

[12]  Although Plaintiffs may attempt to satisfy their burden on this issue via their pending
cross-motion for summary judgment, such an approach is improper.  As stated earlier, cross-
motions for summary judgment must be treated separately. *McKinney*, 548 F.3d at 504 n.4;
*accord U.S. Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1324 (10th Cir. 2010); *Am. Int'l
Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 562 (5th Cir. 2010); *Norfolk S. Ry.
Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010); *Estate of Hevia v. Portrio Corp.*,
602 F.3d 34, 40 (1st Cir. 2010).  Thus, after a defendant has properly moved for summary
judgment on an issue, a plaintiff must satisfy his burden through his response and the record on
defendant's motion, not a cross-claim for summary judgment.

For the reasons stated above, Defendants' motion for summary judgment (R. 199) is GRANTED in the following respects: (1) any alleged breaches taking place before July 2, 2002 are time-barred; and (2) Defendants are granted summary judgment on Plaintiffs' assertion that the Funds were improperly monitored. The remainder of Defendants' motion is DENIED. The parties are directed to reevaluate their settlement positions in light of this opinion and to exhaust all efforts to settle this case.

Entered:

**Judge Ruben Castillo**
**United States District Court**

**Dated:** July 14, 2011